IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, | ) | NO. H-18-CV-786 |
| Plaintiff, | ) | June 21, 2018 |
| v. | ) | |
| IDEXX LABORATORIES, INC., | ) | |
| Defendant. | ) | |

HEARING
BEFORE THE HONORABLE KEITH P. ELLISON

For the Plaintiff:
James Peacock, III
John P. Lahad
Shawn D. Blackburn
Susman Godfrey, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002

For the Defendant:
Michelle E. Gray
Fogler Brar Ford O'Neil Gray, LLP
2 Houston Center, Suite 1640
Houston, TX 77010

Daniel A. Boehnen
Grantland G. Drutchas
McDonnell Boehnen Hulbert & Berghoff, LLP
300 South Wacker Drive
Chicago, IL 60606

Court Reporter: Bruce Slavin, RPR, CMR

10:32 Proceedings reported by mechanical stenography and produced by computer-aided transcription.

THE COURT: Good morning and welcome.

I know you have probably just been through it for Bruce, but for my benefit let's do the appearances of counsel beginning with Plaintiff.

10:32 MR. PEACOCK: Your Honor, Trey Peacock with Susman Godfrey, along with John Lahad and Shawn Blackburn.

THE COURT: Welcome to all of you.

MS. GRAY: Good morning, Your Honor. Michelle Gray on behalf of Fogler Brar Ford O'Neil Gray, which Murray

10:33 Fogler could not be here today, so I am here in his stead.

THE COURT: Well, welcome to you.

MS. GRAY: Thank you. We're here as local counsel for IDEXX Laboratories. And on behalf of IDEXX as well we have Mr. Daniel Boehnen and Mr. Grantland Drutchas.

10:33 THE COURT: I'm sorry. Did you all come all the way from Chicago?

MR. BOEHNEN: We did.

THE COURT: I'm sorry. For a non-evidentiary hearing you're always welcome to appear by phone, but good

10:33 to have you here.

Let me start by saying, in a complex case, I feel very lucky to have lawyers of the quality of all of you. I know most of you personally. Those I don't know personally I know by reputation and I am grateful to have

10:33 your help.

I am also very pleased with your written product. It's, of course, vastly superior to what I normally get and I, once again, validate your reputations as excellent lawyers.

10:34 It is a complicated case, but I think we can clear from the field certain arguments. I will let you have as much time as you want to change my mind, but I do start out as a skeptic.

I don't think we have an *Iqbal/Twombly* 10:34 problem.

I don't think we have a failure to plead breach of contract.

I don't know we need to get into patent invalidity.

10:34 I do think we have a hard question on interpretation of the contract. And, on that, I can't imagine that either side really wants this judge or any judge to interpret the contract, and even less can I imagine that you want a jury of twelve to try to interpret the 10:34 contract. You guys have a long-running commercial relationship and surely the business people in the room, if they were in the room together, could work this out.

I really -- There are some cases that are meant to be tried. This, surely, is not one of them.

10:35 Have you had a go at getting the business

10:35 people together?

MR. PEACOCK: There's been an overture made, Your Honor, and a willingness to go to early mediation and we remain committed to that, if both sides are.

THE COURT: It looks to me like what happened -- this is my guess -- you can correct me -- is that somebody on the business side, at one place or the other way back in 2000, decided to get by without the help of lawyers in drafting this critical couple of paragraphs or in revising them after the lawyers had finished with them. We are left with a cumbersome bit of prose, I think, but we'll work through it, whatever we need to do.

The motion is Defendant's motion; so, we'll start with the Defendant, of course.

And we'll stay here as long as we need to; so, no one need to interrupt anybody else or worry about not getting a voice. We'll stay here as long as we need to.

MR. BOEHNEN: Good morning, Your Honor, and thank you for letting us appear in your beautiful and interesting courtroom.

I hear what you say as to your initial thoughts on the issues and let me see if I can --

THE COURT: -- yeah, change my mind.

MR. BOEHNEN: So, I am going to be speaking primarily on the contract interpretation issue.

Mr. Drutchas will be speaking primarily on the Twombly/Iqbal pleading issue and the patent validity issue, but I'd like to start by giving a little bit more of an overview on where we're coming from.

10:37 So, the Plaintiffs, you know, want to repeat frequently that this is not a patent case, this is a contract case, but no matter how often that's repeated it can't avoid the reality that this is a dispute about a patent license agreement, and the patent license provides

10:37 that there must be a valid patent claim which defines "Licensed Subject Matter" that is allegedly contained in the licensed product, and that must be shown before there can be any contractual obligation on IDEXX's part or any contractual entitlement.

10:37 THE COURT: Assuming for a moment that's true, why did it take 18 years or whatever, 17 years, for your clients to decide that the patent was not valid?

MR. BOEHNEN: Well, there's two answers to that, and let me get both of them.

10:38 I mean, I would ask, equally, why did it take 18 years for the University to continually review our quarterly reports --

THE COURT: I agree. That's a question for them. Fair question.

10:38 MR. BOEHNEN: -- and accept everything?

10:38 10:39 10:39 10:39 10:40

The second answer, and probably the one you're seeking here, is that this decision from the Supreme Court, the *Myriad/Mayo/Alice* decisions, you know, was something that was very, very strongly disparaged in the patent world, and IDEXX made the decision that they wanted to retain good relations with the University and the inventors there because, you know, business relationships, hopefully, extend long into the future, not just on one invention but another; and, so, they made a very pragmatic decision to just simply stay the course. And, you know, there is still legislative and other efforts to try to overturn the decision.

THE COURT: Right. Right.

MR. BOEHNEN: So, they made a pragmatic decision to make a good relationship. So, they kept making their payments, giving their reports, explaining what they were doing, and there was never a hint of any problem from the University.

And, so, that was the point at the end of our reply brief where we say it just goes to support the adage that no good deed goes unpunished.

We were -- IDEXX was shocked --

THE COURT: I do agree with you about that. I think no good deed ever goes unpunished.

MR. BOEHNEN: IDEXX is totally shocked to find itself here today in this circumstance.

So, you know, the patent license agreement expressly requires that there must be a valid patent claim defining "Licensed Subject Matter" --

THE COURT: And there is. Right? There is one. Right now it's a valid patent. It hasn't been set aside.

MR. BOEHNEN: Yeah. But what the law provides is that -- well, if there is a dispute over whether payments need to be made, then, you know, the obligation to make payments is frozen once the defendant -- us in this case -- makes known that we have this dispute. And the question then becomes whether this court is going to find that those patent claims are valid or not. The definition of "Valid Claim" talks about "shall be valid".

And the argument that Plaintiff makes that it's too late is expressly swept away by 15.5 in the contract which says you don't waive anything by not raising it earlier; and that's consistent with the case law that says, if a patent licensee has a dispute over the license, then, once they make that dispute known, you know, things are frozen until --

THE COURT: Are you contemplating a counterclaim to get your money back?

MR. BOEHNEN: Well, the law is less clear. We certainly are contemplating it. The law is less clear on reclaiming earlier payments. Certainly, that's something

10:41
10:41
10:42
10:42
10:42

IDEXX wants to do, is to look at that.

But, you know, again, because of relationships, the focus right now is to explain that we did everything that we thought was proper and we think was proper throughout the life of this contract.

THE COURT: So, we may have an issue that's not yet pled. We may have an issue of reclamation of the payments?

MR. BOEHNEN: Yes, sir.

THE COURT: It's even more complicated than I realized.

MR. BOEHNEN: Yeah. And, as I point out, the contract expressly points out that you don't waive an issue by having not raised it earlier.

So, let me go back to when we filed this motion.

We thought that when we filed this motion it would be an opportunity for the Plaintiff to amend its complaint and, if not to completely eliminate some issues, at least to narrow the issues, and they have chosen not to do that.

When they had an opportunity then to file their opposition brief again, they could have responded in a way that would eliminate some issues or, at least, narrow issues.

For example, you know, they maintain that the

10:42 patent issues are totally irrelevant. Well, they could concede that issue for purposes of this case and, you know, then press their issue that it just is irrelevant, it doesn't matter. They have chosen not to do that.

Alternatively, they could narrow it by choosing one or two of their best claims from one or two of their best patents and, you know, say, 'Those will be what we'll rely upon as representative.' They haven't done that. And, as a result, they've put us in a position of having to

10:43 speculate about 182 different claims from nine different patents, as to which of those may or may not be what they're going to be relying on.

THE COURT: If you didn't know that, why did you ever start paying them anything?

10:43 MR. BOEHNEN: It goes back to the reason that I said before, Your Honor.

First of all, when the payments started, you know, the payments started like eight years, ten years, before *Myriad/Alice* --

10:43 THE COURT: Right. They didn't start until the patent had been granted. Right?

MR. BOEHNEN: Yeah. That's true. And, so, the patent covers, you know, the inventive --

THE COURT: I'm sorry to interrupt --

10:43 MR. BOEHNEN: No. Please.

THE COURT: -- but I want to talk about the issues that are troubling me.

At that point why didn't your client jump up and say, 'Well, you've gotten patents, but which one is relevant to this contract?'

10:43

MR. BOEHNEN: Well, you know, Your Honor, the patents recited nucleotide sequences, polypeptide sequences. So, it covered those sequences.

You know, within a company you make a broad decision on 'They have this now and there's going to be others coming later.' So, I mean, it wasn't unclear which ones were to cover the product. That becomes more of a focus now that we're talking about the invalidity of whatever claim. The question is which one do they want to rely upon as establishing the valid claim, and they can all rise or fall together, or we can have to deal with all the 182 of them.

10:44

10:44

THE COURT: But, as you stand here today, you don't know which patent you were paying all this money for?

MR. BOEHNEN: Well, I hesitate to, you know, say a flat "no" to that. Certainly, you know, we have looked at the claims. We know that some of them, you know, have subject matter that's more squarely within the SNAP products than others. But the question remains which ones are the parties going to fight about or dispute about. Can we

10:45

10:45

narrow it to one or two that are representative of the whole or are we going to fight over all 182 of them?

And, to this point, the Plaintiffs have made clear that they're going to try to fight and obstruct every patent issue in every way they can.

THE COURT: Do you think appeal from any decision this court makes will be to the Federal Circuit or the Fifth Circuit?

MR. BOEHNEN: Federal Circuit.

THE COURT: Okay.

MR. BOEHNEN: So, you know, because they have elected not to try to narrow or focus the issues, you know, we're left with this problem of having to decide are we dealing with all 182 patents claims or can we all agree that it's going to be something vastly less than that?

Again, they could say, 'Hey. Just assume all the patents are invalid. That doesn't matter. It's irrelevant.' They elected not to do that.

But when that is a cornerstone requirement, as to whether there is a contractual obligation on IDEXX or a contractual entitlement by the Board, they can't avoid that. And it's not sufficient for them to just simply argue, 'Well, you know, we have made it very clear. The dispute is whether you pay under small Roman ii or small Roman iii.'

THE COURT: Yeah.

MR. BOEHNEN: Okay. They have made that clear. But what they haven't done is laid the foundation to show there is any entitlement at all or any obligation at all. And pleading -- trying to make clear that, you know, 'We think they should be paying under (iii) when, in fact, they have only paid under (ii),' that doesn't get you there.

10:46

THE COURT: Well, I can certainly understand their choice, though. They thought you had been paying money for ten years or whatever; so, that element of contract breach was already established. You didn't quarrel with the proposition that a patent, whatever patent, was valid and, therefore, triggered your obligation under the contract.

10:47

MR. BOEHNEN: Yeah. But, by that logic, you know, this waiver point works both ways.

THE COURT: Yeah. I know.

10:47

MR. BOEHNEN: By that logic, they have no basis to complain because they have accepted the --

THE COURT: I don't think it's waiver, but I understand their choice in pleading is what I am saying.

MR. BOEHNEN: Yeah. Okay. Well, I understand, you know, the choice at the time they filed the pleading.

10:47

I don't understand the choice after we have made the issue clear to them that there is a threshold question as to whether you have any contractual entitlement or whether IDEXX has any contractual obligation, and that

10:47

turns upon the points that I mentioned.

THE COURT: Okay.

MR. BOEHNEN: As to the contract interpretation issue, you know, IDEXX believes that it's very clear and almost binary in the proper way to look at it. And by "binary" I mean -- You have got three possibilities in the world, starting with the Lyme disease test.

The Lyme disease test can either be sold by itself or combined with something else. Binary.

If it's the first, if it's by itself, it's in small Roman (i).

THE COURT: And that's not contested.

MR. BOEHNEN: That's not part of the --

THE COURT: Okay.

MR. BOEHNEN: Then you get to, well, it's combined with something else. So, now where does it fall?

THE COURT: You're saying because you have a test for heartworm it puts you in --

MR. BOEHNEN: Now the binary decision is: If it's combined with a non-tick-borne disease test it's under (ii).

THE COURT: And everybody agrees that heart disease is non-tick-borne.

MR. BOEHNEN: Absolutely.

But, if it's not combined with a non-tick-borne disease but, instead, combined with other

tick-borne diseases, then it's under (iii). And that's the only way that makes sense as a whole, because if you try to start parsing the language in any other way you eventually kind of wind up chasing your tail to say, well, if you do this, it could be under (iii), but, you know, it could also be under (ii) or vice versa.

THE COURT: Under the second tier -- you call them "I-decks" [phonetic]? --

MR. BOEHNEN: "I-decks" [phonetic].

THE COURT: -- 1 percent, possibly .5 percent, because you would have products to detect Lyme disease in combination with one other veterinary diagnostic or service, for example but not limited to a canine heartworm diagnostic test or service.

I agree with you that's pretty clear. The confusing part to me is where it says "with one other". That was never really intended. It could be with ten others, right, with ten other tests?

MR. BOEHNEN: Well, the question is whether it's combined with another that is non-tick-borne.

THE COURT: Well, I understand that, but why the word "one"? Why is "to detect Lyme disease in combination with other diagnostic tests or services, for example" -- Why is it limited to one?

MR. BOEHNEN: Well, heartworm has always been the

driver in this universe and, you know, the thought and the understanding of everybody involved in it at the time was, you know, if it's combined with heartworm, then it falls under (ii).

10:50 THE COURT: Do you have any notion of what was in the drafter's mind when he or she used "one other veterinary diagnostic test"?

MR. BOEHNEN: Not beyond what I have just explained, Your Honor.

10:50 THE COURT: Okay. You have made good points.

MR. BOEHNEN: And, you know, the other point that relates to that, as to why that interpretation is the only one that gives you an integral whole: If you take any other approach, then you have got possibilities that are either 10:51 uncovered or it's unclear whether they're covered. That's the only approach that gives you a solid integral whole.

In addition, it's important to note that that is the only place in the entire document that either directly or indirectly mentions "heartworm".

10:51 THE COURT: I am with you on that. It is. I agree with you.

MR. BOEHNEN: I will turn the rest of the podium over to my partner, Mr. Drutchas, who will address the pleading issues and the validity issues.

10:51 MR. DRUTCHAS: Good morning, Your Honor.

THE COURT: Good morning.

MR. DRUTCHAS: So, the issue here with respect to the Twombly pleading issue is that the original petition bases its breach of contract claim on two formulated propositions: one, that conditions precedent are met without specifying what those conditions are or what the factual basis is for alleging that those conditions have been met; and, secondly, on the naked assertion that SNAP tests are licensed products and for a licensed product something has to, by definition under the contract, be covered by a "Valid Claim", with a capital "V", capital "C".

THE COURT: Well, but couldn't you figure that out in discovery? Do you really need to know it right now?

MR. DRUTCHAS: Well, the issue under *Twombly* and *Iqbal* is that they have to plausibly plead the basis for that allegation at this stage, Your Honor, in order to meet the threshold basis for getting into litigation and getting into discovery. We really, honestly don't think we do. As Mr. Boehnen said, we expected them to come back and provide at least some kind of plausible basis with respect to an amended complaint or, at the very least, in their motion.

THE COURT: On that issue, on the *Iqbal/Twombly* issue, you're happy with an amended complaint?

MR. DRUTCHAS: If they can provide a plausible basis for a valid claim covering the products at issue such

that they are licensed subject matter and licensed products as required under the provisions of the agreement.

I mean, this agreement is --

THE COURT: Do you agree with your colleague that you have no idea what particular patent your client was paying money for or --

MR. DRUTCHAS: Well, I think you can come down to the narrowing it down to one or two patents that ostensibly cover the accused products at issue here. But, first of all, they haven't done that. Instead, they left it open, nine possible patents and 182 separate claims, Your Honor.

And, second of all, the issue is whether there is -- any of those patents have a valid claim.

THE COURT: But for *Iqbal/Twombly* I would think the fact that you've paid money all these years is a pretty strong indication that one of these patents covers what you're selling and we can figure that out in discovery. I mean, maybe just to avoid an issue on appeal it ought to be repleaded, but it seems like the contract has done just fine for years without anybody bothering to figure out what particular patent is relevant.

MR. DRUTCHAS: But there's two questions, Your Honor. There is two questions with respect to whether there is a licensed product, license subject matter: first of all, whether there is one that covers the product; second of

all, that it's a "Valid Claim" that covers the product, and it's a capital "V", capital "C", in the agreement, Your Honor. And that's the issue, is to narrow this litigation by seeing what exactly they assert to be a valid claim, where they have a plausible basis for asserting they have a valid claim.

10:54

And our motion to dismiss with respect to the validity issues, the 101 issue, is something that could be obviously tailored to the specific patent, the specific claims that they assert are in fact valid. Right now, we're left with seeking representative claims from among 182.

10:55

THE COURT: See, that's where I think business people would be better off dealing with this than lawyers. I mean, I would think you all could get together. You speak the same vocabulary -- that is to say, your clients do.

10:55

MR. DRUTCHAS: We have talked with the client about settlement negotiations, about mediation. We have raised the issue at one point or another with the Plaintiffs.

Part of -- there are some threshold issues here, though, that, in our view, need to be resolved before settlement negotiations would be fruitful.

10:55

THE COURT: If you do want to settle, let me make one recommendation.

I don't care whom you use as a mediator, but I never order mediation. I don't think federal judges have

10:55

that power. I know the clause they're relying on, but I don't think that is sufficient.

If you do want to mediate, my magistrate judge, Dena Palermo, has had great success in getting people to consensus. She's used to big-time litigation. She was a partner at Vinson Elkins and later, after she raised her children, a partner at Andrews Kurth. She's been a very successful mediator. If you want to use her you can contact her chambers directly.

10:56 One advantage of using her is she can say things like, 'Ellison is not going to allow that theory of damages' or 'Ellison is not going to allow that to go to the jury' or whatever.

Yeah. Do you want to say something?

10:56 MR. PEACOCK: If I can just ask a point of clarification, Your Honor.

Do you have a policy, just so I know, if you use a magistrate for mediation, where they can also hear --

THE COURT: No. They're out of the case at that point.

MR. BOEHNEN: Your Honor, if I may just cross the "T" on one of the points that Mr. Drutchas has made.

The issue isn't so much, you know, infringement or claim validity. The issue is on this "Valid Claim" issue --

10:57
10:57
10:57
10:57
10:58

THE COURT: Is coverage.

MR. BOEHNEN: -- is which ones are going to be involved.

THE COURT: Yeah. I understand.

MR. BOEHNEN: They can say that all 182 are covered, but then we know --

THE COURT: No. I understand. The issue today, though: Is that an *Iqbal/Twombly* matter or is that a discovery matter? And you all make good arguments as to why you think it's an *Iqbal/Twombly* matter.

MR. DRUTCHAS: And let me come back, Your Honor, to the valid claim issue.

What the agreement says is a "Valid Claim" is something that 'shall not have been held invalid by a court of competent jurisdiction in an unappealed or unappealable decision.' There is an ellipsis in there that I have omitted.

But the "shall not have been" means this court, at this stage, is that "court of competent jurisdiction" and under Section 15.5 of the agreement there has been no waiver -- there can be no waiver of our right to challenge the validity of those claims.

Claims are held invalid after expiration all the time, Your Honor.

THE COURT: I know that.

MR. DRUTCHAS: So, certainly, nothing exceptional here in that connection and from our perspective that the "Valid Claim" issue is ripe. It's something that is appropriate for resolution on a motion to dismiss. The fact that we're dealing with nine patents and 182 potential claims is in connection with that motion to dismiss on the validity, the 101 issue, is the very reason why we think this complaint falls down on the *Twombly* --

10:58 THE COURT: Okay. I understand the point.

10:58 Thank you.

MR. DRUTCHAS: Thank you, Your Honor.

THE COURT: Let's hear from the other side.

MR. LAHAD: Good morning, Your Honor. John Lahad of Sussman Godfrey for the Plaintiff Board of Regents.

10:59 I do have a PowerPoint and I have some handouts, if the Court is so inclined.

THE COURT: Do you have one for my law clerk, too?

MR. LAHAD: Yes.

So, very briefly, Your Honor, I am going to answer a question that you had for us during counsel's argument about why the Board waited so long, waited until the termination of the license.

10:59

THE COURT: Yeah.

MR. LAHAD: The answer is twofold: First, resources. The Board has tons of licenses, tons of

10:59

licensees, and does not have the resources to perform annual or very frequent audits.

So, audits are typically performed at the end of the license; and we know that based on the language of 10:59 the contract which requires IDEXX to maintain records of sales, net sales, for the duration of the term of the license plus two years afterwards. And that's in Section 5.5 -- excuse me -- 5.3 of the license.

The second reason is the Board is permitted to 11:00 wait that long because limitations and laches do not apply to causes of action brought by the Board of Regents of the University of Texas System pursuant to Section 16.061 of the Texas Civil Practice and Remedies Code and Texas Supreme Court case law as to laches.

11:00 Now --

THE COURT: I don't think I accused you of laches or missing the statute.

MR. LAHAD: Fair enough.

Very briefly. Since 2000 IDEXX has reaped the 11:00 benefits of this exclusive license from the Board. It exploited the underlying technology without threat of patent infringement and, more importantly, it touted that exclusivity to the public, including in representations to its shareholders and the Securities and Exchange Commission.

11:01 Now, after calling them out for not fully

complying with their end of the deal, IDEXX wants to be released from its obligations because it feels the patents are invalid and that we haven't sufficiently pleaded our case.

11:01 They accuse us of trying to expand the issues. This is a simple straightforward breach of contract case governed by Texas law. The issue is whether or not IDEXX should pay 2.5 percent when they pay .5 percent under the terms of the license.

11:01 THE COURT: They did pay .5 percent?

MR. LAHAD: Say again, Your Honor.

THE COURT: They did pay .5 percent --

MR. LAHAD: Correct.

THE COURT: -- not 1 percent?

11:01 MR. LAHAD: Right. The provision calls for 1 percent subject to a stacking discount; and, so, the stacking discount was applicable and they paid 0.5 percent.

THE COURT: For all the years of the contract?

MR. LAHAD: Yes, Your Honor.

11:01 THE COURT: Since the petition was granted?

MR. LAHAD: Exactly.

THE COURT: Okay. I got you. All right.

MR. LAHAD: Since 2004.

Tellingly, I think, IDEXX cites new authority

11:02 that has adopted its view of the world.

THE COURT: Its view of what?

MR. LAHAD: Its view of the world. IDEXX has no legal or factual support to transform this state law breach of contract case into a patent infringement case.

11:02 With all due respect, they are the ones trying to muddy the water and expand --

THE COURT: Well, they definitely want us to take up the patent. Tell me why they're wrong about that.

MR. LAHAD: Well, patent issues are completely

11:02 immaterial to this case.

THE COURT: But the validity of the patent is material, isn't it?

MR. LAHAD: No, Your Honor, it is not. Under the post-*Lear* rule a licensee cannot assert invalidity as a

11:02 defense to a breach of license claim for past royalties, past damages. Courts have called it a well established rule and it's a bright-line rule.

They are essentially arguing that they are off the hook for unpaid royalties and past damages because the

11:03 patents are invalid. That is definitely not the law.

A licensor may pursue a licensee for breach of license notwithstanding the invalidity of an underlying patent. That was the holding by the Federal Circuit in the *Shell* case and that was the holding by four other circuits

11:03 before the Federal Circuit issued its decision in *Shell*.

THE COURT: Hold on a second. Let me make sure I am up with you.

MR. LAHAD: And this is on Slide 11 of our handout.

THE COURT: Page 17 of your brief.

11:03 MR. LAHAD: So --

THE COURT: Just give me a second.

MR. LAHAD: I apologize.

THE COURT: I'm not as smart as you guys. [Reading]

Okay.

11:04 MR. LAHAD: So, before talking about *Shell* let's talk about *Lear*.

*Lear* was a Supreme Court case decided long ago, I think, in the '50s or '60s. And before *Lear* a patent licensee was fully estopped -- *fully estopped* -- from 11:04 challenging the validity of a licensed patent. Couldn't do it. We had a license. Full estoppel. Couldn't raise the specter of invalidity. The Supreme Court in *Lear* did away with licensee estoppel.

Now, fast-forward to *Shell*. This is a case 11:04 out of this court, Judge Gilmore. She certified this exact question to the Federal Circuit and in its decision the Federal Circuit relied on *Lear* and it said, as I quote here, "to prevent the injustice of allowing *Shell* to exploit the protection of the contract and patent rights and then later 11:04 to abandon, conveniently, its obligations under those same

rights." And that's the key reason. A licensee cannot reap the monopoly benefits of a license -- as in this case which is an exclusive license -- and then suddenly try to avoid their obligations by invoking *Lear*.

11:05 So, what's the post-*Lear* rule?

THE COURT: Give me that. Yeah.

MR. LAHAD: It's right here on the slide.

'...a licensee cannot invoke the *Lear* doctrine until (i) it ceases paying royalties and (ii) provides notice to the licensor that the reason for the payment of royalties is because it deemed the relevant claims to be invalid.'

11:05

What's the rule? You have got to stop paying royalties and you have got to tell the licensor, 'We're done paying royalties because your patents are invalid.'

11:05

THE COURT: Okay. Well, I'm not sure of the force of this in this particular case because the obligation to pay royalties came to an end automatically, didn't it?

MR. LAHAD: The obligation to pay royalties terminated, yes, with the license.

11:05

THE COURT: In '17.

MR. LAHAD: Exactly. So, *Lear* applies or the post-*Lear* rule applies to the entire bucket of damages that we're seeking, if -- "if" -- when one of these Supreme Court cases came out -- let's say *Myriad* 2013 -- if, upon reading

11:06

*Myriad*, IDEXX said, 'You know, what? We're done paying royalties because your patents are invalid.' That is when the obligation had been frozen. They would have been off the hook for royalties going forward.

11:06 THE COURT: But you're saying, unless they did this, it's waiver?

MR. LAHAD: Say again.

THE COURT: Unless IDEXX did this there is a waiver?

11:06 MR. LAHAD: There is estoppel. Yes.

THE COURT: There is estoppel.

MR. LAHAD: Yes. The licensee cannot assert patent invalidity. And, so, because in this case --

THE COURT: So, that's essentially the *Lear* rule

11:06 writ small. Right?

MR. LAHAD: Yes, it is a modification of the *Lear* rule that has been adopted by the Sixth, Ninth, Tenth, Third Circuits.

THE COURT: And adopted by the Fifth Circuit in

11:07 *Shell*?

MR. LAHAD: Well, that's the Federal Circuit in *Shell*, yes. And, to be clear, the Fifth Circuit has not yet spoken on this issue.

THE COURT: Okay.

11:07 MR. LAHAD: So, you know, in *Shell* the Federal

11:07 Circuit didn't fashion some novel rule of law.

We have the *PPG* case from the Sixth Circuit in 1976. And in that case the Sixth Circuit held that you don't get off the hook for unpaid past royalties any more than you can get a refund of paid past royalties.

So, we have this notion that they are trying to seek recoupment or a refund for the royalties they have paid, but they're not entitled to that money at all under unanimous --

11:07 THE COURT: That's why a counterclaim has not been filed.

MR. LAHAD: That's why a counterclaim has not been filed. And, even if they did file it, Your Honor, we'd move to dismiss it.

11:07 THE COURT: I understand that.

MR. LAHAD: Not only is it irrelevant, but it would provide no change in rights and no relief and, thus, there would be no case in controversy --

THE COURT: So, the policy argument is a licensee

11:08 should not be able to enjoy the benefits of the license and then later repudiate it. Is that right?

MR. LAHAD: That's exactly right.

THE COURT: And you say there is no contrary authority?

11:08 MR. LAHAD: Absolutely none. The post-*Lear* rule is

clear. It has been unanimously followed by every court facing this issue. It has gotten to the point that licensees have agreed that this is the law.

In the *Icahn School of Medicine* case the court identified or said, quote: "Parties agree that a licensee is estopped from asserting invalidity as a defense to a contractual obligation and royalties already owed at the time of suit."

It is undisputed that IDEXX made payments continuously and without objection for the entire term of the license. The first time it raised invalidity was in its motion to dismiss in this case.

The Supreme Court Section 101 cases that they cite in their brief came out in 2012, '13, '14 and IDEXX didn't stop paying or even raise an issue as to 101. I heard the explanation for it, the pragmatic explanation about maintaining relationships. I appreciate that, I understand that, but that does not get them out of the post-*Lear* rule.

IDEXX cannot point you and we have not found a single case where a licensee has been able to assert patent invalidity as a defense to a breach of license claim for past royalties. Even the cases that IDEXX cites in its brief have followed *Shell*. And, to be clear, I am referring to its reply brief because they don't even raise this issue

11:09 in their actual motion. They don't acknowledge that *Shell* exists. They don't discuss *Shell* or try to distinguish it. They only bring this up in response to our -- In their reply to our response they cite some cases, but, again, all of those cases faithfully applied *Shell*.

The *Levenger* case they cite, quote: "Just because the patents themselves are invalid and unenforceable does not mean that Levenger is entitled to any kind of recission or is absolved from performing its duties under the contract." 516 F.Supp 2d 1289. That's the Southern District of Florida.

11:10 In *Icahn Health and Fitness*, again, the Court didn't need to reach this issue because the licensor and licensee agreed that, quote, "*Lear* applies prospectively from the date a licensee formally challenges the validity of the licensed patents." 2013 Westlaw 4027504 from District of Utah.

11:10 And then they rely on the *Micron* case in which the court said that "*Shell*," quote, "states in no uncertain terms that a claim in an ultimately invalidated patent can still be infringed in the sense that a licensee remains under the duty to pay royalties up to the date it challenges the patent."

11:10 If it accepts IDEXX's view, this court will be the first court ever to permit a licensee who has reaped the

11:11

benefits of a contract to then avoid its past obligations by raising the specter of invalidity.

Now, because it can't find a single case that goes its way, IDEXX tries to distinguish this case law based on the agreement and argues that the parties intended to contract outside the reach of this decade's worth of unanimous authority.

IDEXX says that under the agreement the Board must establish the validity of a licensed patent claim before the duty to pay and, thus, liability from a breach of that duty arises. That's in their reply at Page 8.

This argument fails for several reasons. First, it ignores the presumption of validity, 35 USC 282. That hasn't changed. The Supreme Court cases on 101 didn't change. The presumption of validity. In fact, the Federal Circuit says it's the same burden on the challenger, "clear and convincing".

The licensed patents were valid throughout the term of the license. They were valid each time IDEXX sent payment.

Now, this contractual argument actually ignores thing language of the contract.

If I could have the next slide, please. Next slide, please.

So, we heard a lot about "Valid Claims" in

this license. Here it is. 2.11. "A claim of any unexpired domestic or foreign patent application which shall not have been withdrawn, cancelled or disclaimed nor held invalid by a court of competent jurisdiction in an unappealed or unappealable decision." This definition confirms that the licensed claims are valid until they are held otherwise by a court of competent jurisdiction. Not one of the claims in any of the payments has ever been held invalid by a court of competent jurisdiction.

So, under the definition of "Valid Claim" this argument fails.

They say that the agreement mandates a royalty obligation only if there is a valid claim. That's not right. What mandates payment under the agreement is not a finding by any court that the patents are valid. It is the notice of allowance from the Patent Office that triggers the royalty obligation.

Next slide, please. Next slide. Perfect.

I have highlighted here: "Beginning upon University's receipt of a notice of allowance from either the U.S. Patent and Trademark Office or a foreign patent office for a patent application containing a Valid Claim covering a Licensed Product, a running royalty as follows:" That's the trigger, not determination that a claim is valid, not determination of coverage.

"Beginning upon University's receipt of notice of allowance." That event happened in 2004. That's why they started paying royalties. That's why they continued to pay royalties, albeit not enough, until the patents expired.

11:14 Now, to further negate this contractual argument, we can go to Section 5.1.h of the agreement.

Next slide.

"IDEXX's obligation to pay royalties under subparagraphs 5.1.b and 5.1.c shall continue on a 11:14 country-by-country basis until the expiration of the last-to-expire Valid Claim."

So, what keeps the payment obligation going? The validity and the life of the patents. When the Valid Claims expire and the patents expire, that's when the 11:14 royalty obligation ceases. That's why they stopped paying in 2016 when the patents expired.

THE COURT: Okay. I understand the argument.

MR. LAHAD: Now, putting aside this contractual language, courts have rejected this exact argument.

11:14 In the *Rite-Nail* case, *Rite-Nail Packaging* from the Ninth Circuit -- in that case the license at issue, much like this license, provided that royalties would be paid until a final and unappealable declaration of invalidity. Very similar language.

11:15 And in that case the licensor was trying to

use that language to traverse the rule, the post-*Lear* rule, and say, 'I get royalties even past the date of notice. I get royalties into the future until an appeals court holds the claims invalid.'

11:15 The Ninth Circuit said no. And this is the Ninth Circuit, of course, because this predates -- This case started before the Federal Circuit was established. The Ninth circuit said, no, the rule of *Lear* is clear. They held that licensee was liable for royalties until it took an 11:15 affirmative step, like contesting the validity or notifying the licensor that payments are being stopped because it believed the patent was invalid. The same license as they're relying on in this case, the same application of the post-*Lear* rule.

11:16 Even without the benefit of this contractual language IDEXX's view has been rejected.

Next slide, please. Next slide, please. Next slide. Next slide.

So, we have the *PonyPal* case that we cite in 11:16 our brief. In that case the license defines "Licensed Products" as "products that are covered by one or more valid claims of the patent."

So, in that case the license didn't define "valid claims". But the licensee took the position, like 11:16 IDEXX does today, that the language of the agreement means

that plaintiff is not entitled to receive royalty payments until plaintiff has proved validity, presumably in a court of law -- the argument that IDEXX pitches here, Your Honor -- and, of course, the court rejected that argument.

11:17 It said, you know, '...as federal patent law, against which background the parties entered into the Agreement, there is a presumption of validity...' The court said: "...it seems counterintuitive and needlessly litigious to construe the agreement to require a plaintiff

11:17 to prove validity of the claims of the patent before a defendant would have any obligation to pay royalties under the Agreement. Given the presumption, it is more reasonable to interpret the Agreement language...to mean that Defendant would be obligated to pay royalties until a patent claim was

11:17 determined to be valid or, at the very least, challenged by Defendant as invalid."

The *PonyPal* case went on to follow, like every other court that has faced this issue, the post-*Lear* rule of the Third Circuit, the Sixth Circuit, the Ninth Circuit, the

11:18 Tenth Circuit and the Federal Circuit in *Shell*.

THE COURT: I tell you what. Let me interrupt you a second. We're going to need a break soon.

(Off-the-record discussion)

THE COURT: We'll take a ten-minute break. Sorry

11:18 to interrupt, but the Court needs to do that.

(Brief recess)

THE COURT: Okay. Let's carry on.

MR. LAHAD: My last point on this validity issue, Your Honor, goes back to the definition of "Valid Claim" and that we kind of glossed over, but I want to focus on...

It says it's "a claim of any unexpired domestic or foreign patent or patent application."

All of the patents at issue in the underlying license are expired. And, so, technically, there is no, quote, "valid claim" that we're talking about today, which further goes to the point that --

THE COURT: It doesn't matter what patent you're claiming under?

MR. LAHAD: Well, they're all expired.

THE COURT: But, beyond that, none of it has been invalidated.

MR. LAHAD: Absolutely.

THE COURT: So, it doesn't whether you identify a patent or not. It's, as long as they agree it's under that broad umbrella, then... Is that your argument?

MR. LAHAD: Yes, Your Honor. And I think they have so agreed by their actions.

They say that we've got to identify -- this is a point of identification of more of the *Twombly/Iqbal* issue before the Court -- they say that we must identify which

claim would be infringed in order to meet the pleading standard; and, again, IDEXX cites no law in support of either of these positions.

IDEXX, again, does not offer this court one instance in which a breach-of-license plaintiff has been made to identify at the pleading stage which claims would be infringed but for the license. Not one case. Not in their motion. Not in their reply.

Breach of license cases are not uncommon. We cite to this in our brief. And IDEXX can't give you any example of a court ordering a party to identify at the pleading stage which claims would have been infringed, for good reason. Pleading breach of license, pleading breach of contract, does not require identifying which claims would have been infringed.

They effectively conceded the point that this is not about coverage for them. This is not about infringement for them. It's more of a validity issue. They need to know which claims we're claiming coverage under in order to invalidate them. Well, under the post-*Lear* rule, Third, Sixth, Ninth, Tenth, Federal Circuit, it's irrelevant.

THE COURT: And even if they invalidated they wouldn't get their money back.

MR. LAHAD: And even if they invalidated they

11:27 wouldn't get their money back.

THE COURT: Okay. I understand your point.

MR. LAHAD: There is reference to a condition precedent -- establishing an invalid claim as a condition precedent to obtaining royalties.

That's not the law and, further, that's not what the parties' contract says. There is nothing in the agreement that requires the Board to identify which claims cover the royalty-bearing products before the payment obligations arise. There is nothing in the contract that requires us to do that.

What triggers the payment obligation? The notice of allowance from the Patent Office. And that happened, and then IDEXX paid for over ten years and represented to its shareholders and the SEC that the tests were covered by the licensed patents.

Now, this is not a case where we are trying to expand the scope of the license and reach additional products for which IDEXX --

THE COURT: Now you're talking about the royalty. Right?

MR. LAHAD: The royalty. We're not trying to expand the scope of the license and get products that they haven't paid --

THE COURT: I understand that.

MR. LAHAD: So, in that case, I could see -- I could see --

THE COURT: There would be an issue of validity.

MR. LAHAD: Well, no. I don't think validity is an issue at all. Zero. But in that, if we were trying to expand the scope of the license to get new products, products they didn't pay on for twelve years, I could see their coverage argument. I could see their --

THE COURT: Yeah. I am saying the same thing.

MR. LAHAD: Right.

Now, IDEXX does not argue -- well, actually, before today IDEXX did not argue that it paid when it should not have. It did not argue that the SNAP tests are not licensed products. Until today we had no idea that IDEXX was thinking about getting its money back, and it wouldn't be entitled --

THE COURT: Maybe I was out of line to ask. It came from me.

MR. LAHAD: In its reply they say we missed the point and that we need to plead the key underlying terms that must be resolved.

We have pleaded those terms in the contract. We pointed to 5.1.b. Again, that's the payment obligation. It arises based on the notice of allowance. That's all that's required to trigger it. And you cannot rewrite the

contract and erect conditions precedent that do not exist or manufacture new licensing terms for litigation.

Now, let me finish with addressing the contractual interpretation issue.

11:29 Let's go back to the slide, please.

So, here is the relevant provision. Okay?

Let me step back.

As to *Twombly/Iqbal*, you know, I agree with the Court there is no issue there. It's a contract case.

11:30 State law -- the elements of breach of contract under state law, we have pleaded those.

And then their argument is, 'Well, we're not liable because we don't fit into these' -- 'we've paid the appropriate royalty.' Excuse me.

11:30 THE COURT: Well, I think that's the crux of the case.

MR. LAHAD: Right. I think, Your Honor, their contractual interpretation is wrong. So, let me go to the next slide.

11:30 So, I have got this chart here, okay, that I think reflects what the patents -- excuse me -- what the parties' contract reflects.

Lyme disease, 4 percent. Undisputed.

THE COURT: Yeah.

11:30 MR. LAHAD: Lyme disease plus heartworm only, okay,

11:30 two tests, 1 percent with the stacking discount.

Lyme disease and some other test that's not a tick-borne disease, whipworm, also 1 percent.

Lyme disease plus a tick-borne disease, 2.5 percent.

Lyme disease plus tick-borne plus heartworm or plus whipworm or whatever, still subject to the 2.5 percent.

Now, one of your questions, Your Honor, was what applies if it's Lyme disease plus heartworm plus 11:31 whipworm and other tests that's are not tick-borne diseases.

THE COURT: Yeah. That's one of my question.

MR. LAHAD: And the answer is: I don't think there's a meeting of the minds on that. Based on the contractual language before us, which I don't think is 11:31 ambiguous, I don't think the parties had a meeting of the minds on what royalty would apply if it was Lyme disease plus heartworm plus whipworm.

But I think it's clear from the language of the contract -- you know, you touched on it -- one, if it's 11:31 Lyme disease plus one other test that's not a tick-borne disease, it's 1 percent --

THE COURT: The language I am troubled by is "Lyme disease in combination with one other veterinary diagnostic test." Does that mean only one?

11:31 MR. LAHAD: I think it is. I think it does mean

only one, because the parties knew when they contracted how to say "more than one" because it says in the next one "one or more".

THE COURT: Well, whatever they knew they didn't capture very well.

11:31

MR. LAHAD: "1 percent to detect Lyme disease in combination with one other veterinary diagnostic test, for example, but no limited to, heartworm."

THE COURT: That is the only time heartworm is mentioned in the contract, isn't it?

11:32

MR. LAHAD: It is. But I will submit that tick-borne disease in Roman numeral (iii) is the only time that it is mentioned there as well. So, if we're going to try to apply that logic, it applies to tick-borne diseases.

11:32

'2.5 percent for a product/service to detect Lyme disease in combination with one or more veterinary diagnostic products for services to detect tick-borne disease(s).' Well, they realized that if you have got Lyme disease plus one, it would be 1 percent, subject to stacking, but if that 1 is tick-borne, no matter what else you put with it, you're in the 2.5 percent.

11:32

THE COURT: Okay. So, you're saying that Lyme disease plus other tick-borne plus heartworm is 2.5 percent?

MR. LAHAD: Yes. And if you want to throw in any other test, we would still be in the 2.5 percent bucket.

11:33

Once you have tick-borne in the test you have triggered the 2.5 percent tier.

THE COURT: What is the policy behind this anyway? Why would Lyme disease alone carry a higher percentage than Lyme disease plus something else?

11:33

MR. LAHAD: I think the reason behind it is, if you have got to test for Lyme disease, the royalty is higher because more of that test -- in that case it would be the entirety of the test -- is leveraging the licensed technology.

11:33

So, if I have got a test for Lyme disease only, I am making significant use of licensed technology and, so, I have got a 4 percent royalty. If I, for lack of a better word, dilute that test by adding other tests, I dilute the royalty. If I add other non-tick-borne tests -- heartworm, whipworm --

11:34

THE COURT: Scientifically, the guts of these sets of patents was Lyme disease. Is that right?

MR. LAHAD: It was --

THE COURT: -- a new way of dealing with --

11:34

MR. LAHAD: -- nucleotide for Lyme disease.

THE COURT: Okay.

MR. LAHAD: So, I think that their argument is simply that the presence of heartworm in the test just automatically means it falls in the .5 or 1 percent tier.

11:34

11:34 And, again, the argument that, well, this tier is the only place that mentions heartworm is not very credible. No. 1, heartworm is used merely as an example. No. 2, again by that logic, the only place that the agreement mentions tick-borne disease is in the 2.5 percent tier.

11:35 And, you know, notably, I think that they're trying to escape the plain language of the contract that says 1, Lyme plus one other, e.g., heartworm. That's clear. Lyme plus one or more it's a test, tick-borne. So, the parties intended that if I have got Lyme disease plus a tick-borne, whatever else they have got --

11:35 THE COURT: The problem is it says "one or more veterinary diagnostic products or services to detect tick-borne diseases," nothing about heartworm.

11:35 MR. LAHAD: Correct. So, if I have got a product that tests for Lyme disease in combination with another tick-borne disease -- there's several -- e. canis is one of them -- if I have a test for that, clearly 2.5 percent. Two tests, Lyme disease + tick-borne, 2.5 percent. I think that's noncontroversial.

11:36 The question is what happens when I add a third test. Because that's the issue here. All the tests at issue have tests for at least three things -- Lyme, tick-borne and heartworm. The question is what happens when

you add heartworm to Lyme plus tick-borne. And I think, because you're already in the 2.5 percent tier, adding heartworm, whipworm, ringworm, whatever kind of worm, doesn't take you out of the 2.5 percent tier.

THE COURT: Okay. Are you done?

MR. LAHAD: Unless the Court has any more questions.

THE COURT: No. You will have another chance at bat, but let me go back to Defendants. I dare say they want to say something.

MR. BOEHNEN: Well, Your Honor, we'll pick up where Mr. Lahad left off and then Mr. Drutchas will deal with other issues, the contract interpretation issue.

THE COURT: Okay.

MR. BOEHNEN: And your question as to what was behind this structure is exactly what makes sense to illuminate the point that I was making earlier.

In (iii) -- everything about small Roman (iii) is all directed to tick-borne diseases.

THE COURT: Yeah. Yeah.

MR. BOEHNEN: And, so, the logic and why it makes sense is that:

Small Roman (i) is 4 percent, the highest. That's where the Lyme disease test is sold by itself. Clearly, that means, you know, that was the driver of that

sale.

THE COURT: I got that. Yeah.

MR. BOEHNEN: The reason that (iii) is 2.5 percent is because there's other tick-borne tests that are now involved, but Lyme disease was recognized as what is probably the driver of that panel of tick-borne diseases. So, it's less than 4, but because it doesn't involve heartworm it's more than 2.

THE COURT: More than 1. Right?

MR. BOEHNEN: More than the 4 percent that's provided in small Roman (i).

So, small Roman (iii), which is the Lyme disease test plus other tick-borne, is 2.5. So, it's less than 1 where Lyme is by itself, but it's still more than a heartworm test because Lyme disease was thought to be the driver of this tick-borne panel.

THE COURT: Okay.

MR. BOEHNEN: But, too, heartworm was then and remains today, you know, the real driver of all of these tests. Anybody who has a dog knows, you know, what you're worry about most is heartworm. And, so, that would be the driver of (ii) which gave the lowest royalty rate and, indeed, the apportionment of --

THE COURT: If that's the most important affliction, why wouldn't that carry the highest percentage

or the lowest percentage? If that's the affliction you're most worried about --

MR. BOEHNEN: Heartworm.

THE COURT: -- yeah -- why wouldn't that carry even a higher percentage?

MR. BOEHNEN: Well -- And, indeed, the point is that IDEXX may be paying royalty to other people for heartworm.

The point is the presence of the heartworm test drives down the amount of royalty that's paid to the University of Texas because the Lyme disease is no longer the driver of that product. Lyme disease is now a smaller component of that product that has heartworm. Heartworm is the driver of that product; so, that's why it has the lowest royalty.

Does that make sense?

THE COURT: Well, I understand what you're saying. None of this makes a whole lot of sense. I think it's a very badly drafted paragraph.

If that's really the heart and part of -- if that's really what we most fear, then heartworm evaluatives would cost more rather than less than Lyme disease for the same reason that neurosurgery costs more than poison ivy.

MR. BOEHNEN: Well, yeah.

So, let's say you have got $15 for a product.

If heartworm is there, then the Lyme disease test is a much smaller component of the driver of the sales. So, the royalty that you pay for the Lyme disease test is smaller.

THE COURT: I understand what you're saying.

11:40 MR. BOEHNEN: But, again, going to the slide that Mr. Lahad had that showed all of these various combinations, the problem with that is he's including now into small Roman (iii) diseases that are not tick-borne and yet (iii) applies only when it's all tick-borne. Everything about
11:40 small Roman (iii) is a product that has combined various tick-borne disease tests.

THE COURT: Okay. Thank you.

MR. DRUTCHAS: Plaintiff, could you put your Slide 3 back up.

11:40 THE COURT: Or I can just turn to it. Slide 3. I can turn to it.

MR. DRUTCHAS: Well, I'd like to point out some specific language, Your Honor. I am going to be talking about the Twombly issue and especially the "valid claim"
11:41 issue and the validity issue.

THE COURT: Yeah.

MR. DRUTCHAS: This agreement is unique among any of the cases that have been cited by any of the parties in this case because it explicitly requires a "Valid Claim",
11:41 capital "V", capital "C", and it defines what a "Valid

Claim" is and requires that there be such a valid claim before there is a licensed subject matter, before there is a licensed product and before there is any royalty obligation of this agreement. That's why a "Valid Claim" is a condition precedent.

11:41

THE COURT: But that was really aimed at something different. Wasn't that aimed at having a fixed start date for the royalties?

MR. DRUTCHAS: Well, so, Your Honor, if I may -- I don't know if we have a laser pointer here, but --

11:41

THE COURT: What do you want?

MR. DRUTCHAS: Okay. Well, if you look at 5.1.b, right at the very top it says "Beginning upon the University's receipt of notice," blah, blah, blah, "of a patent application containing a Valid Claim covering a licensed product..."

11:42

THE COURT: Yeah.

MR. DRUTCHAS: Yes. That's the notice issue.

THE COURT: Yeah, I got that.

11:42

MR. DRUTCHAS: That is where the royalties begin.

But if you look down to each of the royalty obligations where it says you pay the 4 percent, 2 percent or 2.5 percent, each of them require licensed products. License products, licensed products, licensed products [pointing].

11:42

The definition to have a licensed product it has to be something that incorporates Licensed Subject Matter -- capital "L", capital "S", capital "M" -- and that, Your Honor, is explicitly defined -- if I could have the Elmo turned on, please.

So, you need a licensed product, Your Honor, and a "licensed product" means "any product or service," blah, blah, "with which a Licensed Subject Matter is combined, packaged, retrofitted," et cetera. So, you have to have Licensed Subject Matter to have licensed product.

So, a condition precedent for a licensed product is anything that incorporates Licensed Subject --

THE COURT: Again, I think that was aimed at when the royalty obligation began.

You don't disagree, generally, with the proposition that it would be unfair to allow a licensee of a patent to enjoy the benefits of the patent and then say, 'It's no good. I want my money back'?

MR. DRUTCHAS: In general, I would agree with that, but the issue, Your Honor, is that, here, there is a contractual requirement for a valid claim before there is -- in order to have any royalty obligation.

2.6 of the agreement says: "Licensed Subject Matter means inventions/discoveries covered by a Valid Claim of the patent rights."

11:44 11:44 11:45 11:45 11:45

And what the Plaintiff has done here, by failing to challenge our royalty through the entire term of the agreement and doing what they have done and establishing this whole course of conduct, is preclude us from establishing at any earlier time that these -- during the term of the patents that these patents were invalid.

Had they challenged us five years ago and said, 'You owe us 2.5 percent,' we would have turned around at that time, while the patents were still in force, and challenged the validity at that stage.

But this whole course of conduct as established by the Plaintiffs, in coming after the fact and trying to assert now, all of a sudden, that there is a 2.5 percent royalty due under this agreement, is what denied us the opportunity to challenge this valid -- whether the validity of the claim --

THE COURT: You're saying it hasn't denied it. You're saying you can challenge it.

MR. DRUTCHAS: And even now we can challenge it --

THE COURT: It doesn't seem unfair if you can still challenge it.

MR. DRUTCHAS: Well, that's true, that's true, but we wouldn't be facing this argument that now it's too late to challenge it, Your Honor, that we have waived that, even though there is a no-waiver provision under 15.5.

Then the "Valid Claim" definition, Your Honor.

Licensed Subject Matter requires a valid claim is a condition precedent for there to be a licensed product. And the Valid Claim is -- Establishing that there is a valid claim -- Allowing us to establish that there is no valid claim is part of the prerequisite and a condition precedent before there is any royalty obligation under this agreement under (i), (ii) or (iii) of 5.1.b. That's first of all.

Second of all, with respect to the *Kohle* case, what the *Kohle* case says very explicitly is this is all an issue of contract.

And if you look at -- and, indeed, if you look at the Defendant's response brief at Page 17, the distinctive aspect -- and forgive me -- I have scribbled on it a little bit, Your Honor -- the distinctive aspect of the *Kohle* case and each of the cases that have relied on the *Kohle* case is that, as Plaintiffs themselves have indicated in their response brief, enforcement of these contracts terms, the one in *Kohle*, is not contingent upon the validity of the patent which defines the subject matter of the license.

That is the very distinction that takes us out of the *Kohle* case and, instead, establishes that we in this particular instance because of the contract, because the contract allows us -- requires there to be a valid claim and

allows us to challenge validity, we're in this situation now.

THE COURT: It still seems unfair because during the period of the contract, while you were using the license, it seems like the patent world did consider it a valid claim. It hadn't been invalidated, it hadn't been set aside, and you had the benefits of exclusivity for all that time. And now you're saying that it was invalid all along even though you had the benefit of treating it as valid.

11:47 MR. DRUTCHAS: First of all, Your Honor, this is -- the issue here is, again, have we waived that argument.

THE COURT: I'm not saying you have waived it, but, as a matter of policy, that seems like really bad policy, for you to have the benefit of the exclusiveness and then come back and say, no, it wasn't exclusive at all because it wasn't any damn good.

MR. DRUTCHAS: Well, the issue, again, here is that's exactly what the contract says. The contract requires there to be a valid claim for royalty obligation and allows us to challenge the validity.

And I think the case law that Plaintiffs cite, the *PonyPal* case that they spent a fair amount of time on -- there is a plea disconnect here, Your Honor, because we are not arguing that they have to -- at the end of the day they have the burden of proving validity, which is what *PonyPal*

questioned, validity of all of the claims that they're going to assert.

We fully recognize we have the burden at the end of the day to test the presumption of validity and establish the claims are invalid.

11:48

THE COURT: Yeah.

MR. DRUTCHAS: We have done that, we believe. That's exactly what the third section of our brief was, to establish under *Mayo*, *Myriad* and these other cases that these claims drawn to natural subject matter are invalid as a matter of law.

11:49

And the court there didn't -- the Supreme Court there didn't say, well, patents from here on out are going to be judged by these standards. The Supreme Court found those patents were invalid ab initio because they covered natural products.

11:49

THE COURT: What's been the treatment of the royalty payments that were made while the patents were considered valid?

MR. DRUTCHAS: I'm sorry, Your Honor. Could you repeat.

11:49

THE COURT: What has been the treatment of the license payments made during the period those patents were considered valid before the Supreme Court invalidated them? Did people all say, 'Okay. You owe me' -- 'all the licensee

11:49

payments I made I want back?' Did that argument fly in favor --

MR. DRUTCHAS: There have been no cases that have addressed whether *Mayo/Myriad* should allow for recoupment of --

THE COURT: So, the Supreme Court can speak to it.

MR. DRUTCHAS: The Supreme Court certainly can speak to it. But it did say that these claims are invalid ab initio --

THE COURT: I understand the point.

MR. DRUTCHAS: -- and denied any damages for -- under any -- and, ultimately, damages were denied for any of these patents from the date of first infringement or first grant, whichever happened first.

So, from that perspective, Your Honor, each of the cases that they cited -- and I come back again to the *Kohle* case --

THE COURT: It's K-o-h-l-e for the court reporter.

MR. DRUTCHAS: Yeah, K-o-h-l-e. Right. And I also refer to the *Shell* case in some of the briefing, Your Honor.

The Federal Circuit made clear that "Nothing in this license made payment of royalties contingent upon validity of the '698 patent." That's the exact opposite of what we --

THE COURT: Give me the passage again.

MR. DRUTCHAS: It's 112 F3d 5178. "Nothing in this license made payment of royalties contingent upon the validity of the '698 patent."

We have the exact opposite here. The royalties are explicitly contingent upon --

THE COURT: -- there being a valid --

MR. DRUTCHAS: -- their validity.

And what the Federal Circuit finished that paragraph up with was that "in other words, contract law governs the enforcement of the license." And that's a very important point that we've said -- It's cited in our briefs. It's quotes in our briefs. In other words, contract law governs the enforcement of a license.

And here, under interpretation of the contract, there is no question that validity is the ultimate question.

THE COURT: I am surprised that's not part of every contract.

MR. DRUTCHAS: Pardon?

THE COURT: I am surprised that's not a part of every patent and licensing agreement.

MR. DRUTCHAS: I have seen no cases where there has been an explicit definition of "valid claim" like this and Plaintiffs haven't presented any.

THE COURT: I understand.

Thank you very much.

MR. DRUTCHAS: Thank you.

MR. BOEHNEN: Your Honor, just to --

THE COURT: Briefly. Briefly.

11:52 MR. BOEHNEN: Very brief.

The point that we wish to make is that this post-*Lear* rule that the court relies upon certainly doesn't -- as Mr. Drutchas said, doesn't give a claim for recoupment of previously paid royalties, but what it does is 11:52 draw a bright line and says at the point of time of a challenge -- okay? -- from that point on --

THE COURT: Okay.

MR. BOEHNEN: -- there is no obligation to pay royalties at the point in time of a challenge, and that's 11:52 what we're raising right now.

THE COURT: You're making the challenge, but the payments have already been made.

MR. BOEHNEN: Well, we're not talking about recoupment. They're saying that more needs to be made.

11:52 THE COURT: Okay.

MR. LAHAD: I mean, that is the rule. And we're arguing that the underpayment of royalties throughout the entire term of the license, whether there is a "Valid Claim" -- capital "V", capital "C", lower case "v", lower 11:52 case "c". Those are not subject to this invalidity defense.

No. 1, it's not a waiver. There's little of a slight of hand here in reference to waiver position. It's not a waiver. They never had a right under the post-*Lear* rule.

11:53 THE COURT: To do what?

MR. LAHAD: To use invalidity as a defense to royalty payment.

I heard its twice mentioned about this waiver provision. It's totally inapplicable. They never had the right; so, they couldn't waive it. 11:53

If the existence or the establishment of a valid claim was a condition precedent, why did they pay? Why did they pay for 14 -- for 12, 13 years? They paid after *Alice*, after *Myriad*, after *Prometheus*, all the Supreme Court cases. 11:53 They paid without objection. The first time they objected was in this motion to dismiss.

THE COURT: I understand. I understand.

MR. LAHAD: So, throughout the parties' agreement they treated the claims as capital "V" capital "C" claims. 11:54 They treated the claims as valid. They never challenged them even after the Supreme Court cases.

They argue that, well, this contractual language takes this case out of the post-*Lear* rule. Completely wrong. The contractual language does not 11:54 condition payment on validity. We know that because of the

plain language. Payment is conditioned on notice of allowance. We know that because of the parties' performance. They paid without making us -- They never said, 'Hey. Which claims' --

11:54 THE COURT: I think I understand.

MR. LAHAD: And, finally, I will add this.

They say that we have not presented a case that's had this same kind of language. Actually, the *Rite-Nail* case, the Ninth Circuit, the language is pretty

11:54 close. And the same language about the patent -- royalties being due until a patent was held invalid by a court of competent jurisdiction. Same results. Same application.

THE COURT: Okay.

MR. LAHAD: Thank you, Your Honor.

11:55 THE COURT: Okay. Let's talk a little bit about your schedule.

I appreciate your chance to get together on this. This is, I am afraid, too leisurely a schedule for my taste. I think we can do better than a trial in May of

11:55 2020.

What I propose is a bifurcated process. I think what we ought to do is have a short period of discovery where we find out what external evidence there is on the meaning of this contract. I don't know how many

11:55 people that would involve deposing, but I can't believe it's

very many. And then we ought to come back with competing summary judgment motions on the contractual language.

What do you say about that?

MR. PEACOCK: I'm sorry, Your Honor. Can you repeat your question. I was taking my notes.

THE COURT: My question is: What do you think about my proposal? My proposal is we have maybe a bifurcated discovery process. We first spend a few months finding all the external evidence that we can on what the contract means.

MR. PEACOCK: Your Honor, generally speaking, I am okay with that. I guess before I give a full-throated "yes" I'd like to know what the second half of your envisioning might --

THE COURT: With that having been cleared up, then we'll turn to any issues that remain.

I think it will clear it up. I think the contract either points to your interpretation or the other side's interpretation. Full stop. That's the end of the case and we don't have to worry about patent law. We don't have to worry about *Iqbal/Twombly*. We don't have to worry about preconditions. That's it.

MR. PEACOCK: We're fine with that, Your Honor.

MR. BOEHNEN: So, Your Honor, as I am hearing you, then, this Phase I on exploring the meaning of the contract

would encompass not just the language in 5.b (ii) and (iii) but also the meaning of "Valid Claim", "Licensed Subject Matter", "Licensed Product".

THE COURT: I really meant the former, that we talk about what this one paragraph means.

MR. PEACOCK: That's what we understood, Your Honor.

MR. BOEHNEN: Okay. But then, Your Honor, if we get into pleading, I guess my concern is, if we go forward under that -- I mean, our normal pleading -- You know, if you were to deny our motion entirely and go forward on that, our next step is going to be to file an answer and counterclaim that will be raising the patent issues. But I am understanding you to say that any discovery into those aspects of the case, including contract, would be deferred until after we deal with (ii) and (iii).

THE COURT: Yeah. And you may not need to go there at all. You may win on the contract.

MR. BOEHNEN: Okay. So, then we would go forward with our full pleading of all of our defenses, and they can respond in a reply to the counterclaim on everything, but discovery would actually proceed just on the Section 5.b terminology?

THE COURT: Right. Because I think you may win at that level and then you save all this time not exploring

what a "Valid Claim" means and all that.

MR. BOEHNEN: Okay. So, we don't lose anything later.

THE COURT: No. I didn't say the case would automatically be over. We'll establish one central tenet of the case.

MR. BOEHNEN: We understand.

THE COURT: How much time do you need?

MR. BOEHNEN: If we're only going into that aspect of the discovery -- And, so, then we're going to defer motion practice on our counterclaims?

THE COURT: Yes.

MR. BOEHNEN: Okay. Then I would imagine probably around three or four months, Your Honor.

THE COURT: Okay. Why don't we aim for --

Is that agreeable, Mr. Peacock, or whoever is handling this?

MR. PEACOCK: I'm sorry, Your Honor?

THE COURT: He suggests three or four months.

MR. PEACOCK: We think that's fine, Your Honor.

We want one additional clarification. Anticipating that they would file a counterclaim, we understand what you're suggesting to mean we would still be allowed to answer that.

THE COURT: Yeah. Sure.

MR. PEACOCK: And if there were any responsive pleading under Rule 12 that we wanted to file, we would be -- those would be suspended until an undefined --

THE COURT: Well, I don't want the counter -- There is no laches. There is no statute of limitations that's going to run while this case is pending. The Defendants will have the right to file a counterclaim if the summary judgment practice I am talking about doesn't resolve the case. And you will have all the usual rights to respond.

MR. PEACOCK: Thank you, Your Honor.

THE COURT: This is June. This is the sixth month. Let's turn to the tenth month. How about October 22nd for competing motions for summary judgment?

MR. PEACOCK: That's fine with us, Your Honor.

MR. BOEHNEN: Yes, Your Honor.

THE COURT: That way, you won't have to come back here while it's hot.

MR. PEACOCK: You never know about late October, Your Honor.

THE COURT: Yeah, I know. Sometimes Halloween is pretty uncomfortable.

MR. BOEHNEN: Yeah. I was hoping for January or February, Your Honor.

THE COURT: Very well argued. Thank you very much.

COURT REPORTER'S CERTIFICATE

I, BRUCE SLAVIN, certify that the foregoing is a correct transcript from the record of proceedings in the above entitled matter, to the best of my ability.

*s/Bruce Slavin*
BRUCE SLAVIN, RPR, CMR