United States District Court
Southern District of Texas
**ENTERED**
July 16, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CASE NO. 4:18-CV-786 |
| IDEXX LABORATORIES, INC., | § § | |
| *Defendant*. | § § § | |

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff's motion to remand this state-law breach-of-contract suit to Texas state court for lack of subject-matter jurisdiction, ECF No. 70.[1] The central question presented is whether Plaintiff, the Board of Regents of the University of Texas System ("the Board"), is an "alter ego" of the state of Texas and thus not a "citizen" under the federal diversity jurisdiction statute, 28 U.S.C. § 1332. Having considered the parties' briefing and arguments,[2] and the applicable law, the Court concludes that the Board is an alter ego of the state and therefore RECOMMENDS that the motion to remand be GRANTED.

_____

[1] The District Judge referred the motion pursuant to 28 U.S.C. § 636. *See* Notice of Referral, ECF No. 72. The motion is dispositive and thus appropriate for a report and recommendation. 28 U.S.C. § 636(b)(1)(B).

[2] Defendant filed a response, ECF No. 74, Plaintiff a reply, ECF No. 78, and Defendant a sur-reply, ECF No. 88. The parties also presented oral arguments before the Court.

## I.  BACKGROUND

The Board filed this suit in the 189th Judicial District Court of Harris County, Texas, alleging that it owns patented technology relating to the diagnosis, prophylaxis, and treatment of Lyme disease; that it entered into a license agreement pertaining to that technology with Defendant Idexx Laboratories, Inc. ("Idexx"); and that Idexx breached the agreement by underpaying royalties to the Board. ECF No. 1-2. Idexx, a Delaware corporation with a principal place of business in Maine, filed a notice of removal claiming federal subject-matter jurisdiction based on diversity of citizenship between it and the Board. ECF No. 1. The Board now moves to remand, arguing that subject-matter jurisdiction is lacking because the Board is an alter ego of the state of Texas and therefore not a "citizen" within the meaning of 28 U.S.C. § 1332.

## II.  LEGAL STANDARD FOR REMAND

The federal Removal Act provides that, in general, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction may be removed by the defendant" to federal district court. 28 U.S.C. § 1441(a). "Remand is required 'if at any time before final judgment it appears that the district court lacks subject matter jurisdiction over a case removed from state court.'" *Vantage Drilling Co. v. Su*, 741 F.3d 535, 537 (5th Cir. 2014) (quoting *Int'l Primate Prot. League v. Admin'rs of Tulane Educ. Fund*, 500 U.S. 72, 87 (1991));

2

28 U.S.C. § 1447(c). On a motion to remand, the removing party "bears the burden of showing that federal jurisdiction exists and that removal was proper." *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 397 (5th Cir. 2013); *Vantage Drilling Co.*, 741 F.3d at 537; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [the] limited jurisdiction [of the federal courts], and the burden of establishing the contrary rests upon the party asserting jurisdiction." (citations omitted)). "Any ambiguities are construed against removal and in favor of remand to state court." *Mumfrey*, 719 F.3d at 397.

## III. DISCUSSION

The sole proffered basis for removal of this action is the diversity jurisdiction statute, which grants federal district courts original subject-matter jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States," 28 U.S.C. § 1332(a)(1).[3] "There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction." *Moor v. Alameda County*, 411 U.S. 693, 717 (1973); *accord Postal*

---

[3] There is no merit to Idexx's argument that, even if diversity jurisdiction is lacking, removal could be deemed proper based on federal-question jurisdiction over its counterclaims against the Board for patent non-infringement and invalidity. ECF No. 74 at 27–30. Recognizing that the well-pleaded complaint rule generally prohibits removal based on a federal-law counterclaim, Idexx invokes 28 U.S.C. § 1454(a), which authorizes the removal of "[a] civil action in which any party asserts a claim for relief arising under any Act of Congress relating to patents." But Idexx never "assert[ed]" its patent counterclaims in state court and has never properly done so in this court. In fact, the district judge denied Idexx's motion to vacate a court order that prohibits it from asserting counterclaims at this time. *See* Minute Entry dated May 13, 2019.

*Telegraph Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894) ("[I]t is well settled that a suit between a state and a citizen or a corporation of another state is not between citizens of different states . . . ."). And like the state itself, "state agencies that are the alter ego of the state are not citizens for the purposes of diversity jurisdiction." *Texas Dep't of Hous. & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 926 (5th Cir. 1995); *see also Moor*, 411 U.S. at 717 ("[A] political subdivision of a State, unless it is simply 'the arm or alter ego of the State,' is a citizen of the State for diversity purposes."). "On the other hand, if the agency is an independent one, separate and distinct from the state," then it will be considered a "citizen" of the state and subject to diversity jurisdiction. *Tradigrain, Inc. v. Mississippi State Port Auth.*, 701 F.2d 1131, 1132 (5th Cir. 1983).

Consequently, the question of remand turns on whether the Board is an "alter ego" of the state of Texas. If it is, the motion to remand must be granted; if the Board is an "independent agency" of the state, however, the motion must be denied.

In deciding whether a state agency is an alter ego of the state or an independent agency for purposes of diversity jurisdiction, "the essential question is whether the state is the real party in interest in the lawsuit." *Tradigrain*, 701 F.2d at 1132; *see also State Highway Comm'n of Wyoming v. Utah Constr. Co.*, 278 U.S. 194, 199–200 (1929). In *Tradigrain*, the Fifth Circuit adopted a multi-factor balancing framework for answering that question, stating:

4

>If the agency's status is unclear, the court must look to any and all
>available sources for guidance. The court should consider whether the
>agency has been granted the right to hold and use property, whether it
>has the express authority to sue and be sued in its corporate name, the
>extent of its independent management authority, and a factor that
>subsumes all others, the treatment of the agency by the state courts. . . .
>Other relevant factors might include: (1) whether the state is
>responsible for the agency's debt; (2) whether the agency is primarily
>concerned with local, as opposed to statewide problems; and (3) the
>degree of general financial autonomy of the agency. The source
>material for the court's analysis is found in the state's constitutional,
>statutory and decisional law.
>
>In a typical situation, some factors will suggest that the agency is a
>"citizen" while others will just as strongly suggest that the agency is
>merely an alter ego of the state. The court must balance these against
>each other in reaching its conclusion.

701 F.2d at 1132–33 (internal quotation marks and citations omitted). The Fifth

Circuit later summarized the *Tradigrain* framework as comprising "many factors . . .

including: (1) whether state statutes and case law characterize the agency as an arm

of the state; (2) the source of entity funding; (3) the degree of local autonomy;

(4) whether the entity is concerned primarily with local, as opposed to statewide

problems; (5) the authority to sue and be sued in its own name; and (6) the right to

hold and use property." *PYCA Indus., Inc. v. Harrison County Waste Water Mgmt.

Dist.*, 81 F.3d 1412, 1416 (5th Cir. 1996).

### A. The *Tradigrain* framework applies to this case

Idexx contends that *Parks v. Carriere Consolidated School District*, 12 F.2d 37 (5th Cir. 1926), controls this case, not *Tradigrain*. ECF No. 74 at 12–18.[4] *Parks* involved a suit originally brought by a Mississippi school district in Mississippi state court against two defendants, both citizens of other states. The defendants removed to federal district court based on diversity, but when judgment was entered in favor of the school district, the defendants appealed, arguing that the district court lacked subject-matter jurisdiction because the school district was "identical with the state." *Parks*, 12 F.2d at 37. The Fifth Circuit rejected the defendants' argument and affirmed, stating the operative rule as follows: "If a school district is authorized by the legislation creating it, as construed by the courts, to contract and sue in its own name, then it is a body corporate, or a quasi[-]corporate body, and as such a citizen of the state under which it is organized, within the purview of the Removal Act." *Id.* at 38. Because the Mississippi Supreme Court had held that the state's school districts possessed "the capacity to contract and to sue to enforce their contract in their own names," the court of appeals concluded that the school district in *Parks* was a citizen of the state and hence subject to diversity jurisdiction. *Id.*

---

[4] Citations of specific pages in documents filed with the Court reflect the page numbers listed in the CM/ECF-generated header.

Idexx maintains that, under *Parks*, the Board's capacity to sue and contract in its own name—a capacity which, for present purposes, it is undisputed the Board in fact possesses—suffices to render it a citizen of Texas within the purview of the diversity jurisdiction statute. The trouble with this contention is that it inexorably conflicts with the Supreme Court's post-*Parks* decision in *Moor v. Alameda County*, 411 U.S. 693 (1973). In *Moor*, the Supreme Court considered whether a California county was a citizen of the state for purposes of diversity jurisdiction. *Id.* at 717–22. The Supreme Court concluded that it was, citing the following aspects of California law as "persuasive indicia of the independent status occupied by California counties relative to the State of California": the fact that "under California law a county is given 'corporate powers' and is designated a 'body corporate and politic'"; that "[i]n this capacity, a county may sue and be sued"; that a county "is deemed to be a 'local public entity' in contrast to the State and state agencies"; that "the county, and from all that appears the county alone, is liable for all judgments against it and is authorized to levy taxes to pay such judgments"; that a California county may "sell, hold, or otherwise deal in property" and "may contract for the construction and repairs of structures"; that counties "are authorized to provide a variety of public services such as water service, flood control, rubbish disposal, and harbor and airport facilities"; and that counties are "[f]inancially . . . empowered to issue general obligation bonds payable from county taxes," with "[s]uch bonds creat[ing] no

obligation on the part of the State, except that the State is authorized to intervene and to impose county taxes to protect the bondholders if the county fails to fulfill its obligations voluntarily." *Id.* at 719–21 (footnotes omitted). In addition, the Supreme Court found "the clearest indication possible" in a decision of the California Supreme Court which held that a county was "sufficiently corporate in character" to permit the state attorney general to obtain a writ of mandate against it. *Id.* at 720–21 (citing *People ex rel. Younger v. County of El Dorado*, 487 P.2d 1193, 1199 n.12 (1971)). The California Supreme Court, in turn, had based that conclusion primarily on state statutes which provided that a county is "a body corporate and public" and "may sue and be sued." *Younger*, 487 P.2d at 1199 n.12 (citing CAL. GOV'T CODE §§ 23003 and 23004(a)).

*Moor* makes clear that any determination of whether a state entity is sufficiently independent from the state so as to bring it within the scope of diversity jurisdiction must be based on a comprehensive assessment of all relevant state statutory and decisional authorities, not on one or two considerations alone. An entity's capacity to sue and contract in its own name, while relevant, is not per se dispositive.[5] *Tradigrain*'s multi-factor balancing framework keeps faith with this

---

[5] *Moor* noted that in *Chicot County v. Sherwood*, 148 U.S. 529 (1893), the Supreme Court "ruled that a county was subject to diversity jurisdiction even where there was no state statute under which counties were authorized to sue and be sued." 411 U.S. at 718 n.40 (citing *Chicot County*, 148 U.S. at 533–34).

8

basic teaching of *Moor*. By contrast, *Parks*, inasmuch as it set forth a categorical rule by which an entity's capacity to sue and contract in its own name is the sole measure of its status as a "citizen" under the diversity jurisdiction statute, is incompatible with *Moor* and, consequently, not good law. *See Gahagan v. United States Citizenship & Immigration Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." (internal quotation marks and citation omitted)).[6]

It is true that the county in *Moor* was a defendant, whereas the school district in *Parks* was a plaintiff, but that distinction makes no substantive difference here. *Moor*'s reasoning does not apply with any less force just because the entity under consideration stands in the position of plaintiff instead of defendant. Nor does anything in § 1332's text or purpose, or in practice under it, support the notion that an entity's position as plaintiff or defendant affects its status as a "citizen" for purposes of diversity jurisdiction. *Cf. Illinois v. City of Milwaukee*, 406 U.S. 91, 98 (1972) ("If a political subdivision is a citizen for diversity purposes, then it would make no jurisdictional difference whether it was the plaintiff or defendant in such

---

[6] Notably, in the near-century since *Parks* was decided, the Fifth Circuit has cited it only once, and even then seems to have read it as principally involving an Eleventh Amendment issue. *See Kirby Lumber Corp. v. Louisiana*, 293 F.2d 82, 84 (5th Cir. 1961) ("The only error relied upon in [*Parks*] was the claim that the [d]istrict [c]ourt was without jurisdiction to hear and determine the case for the reason the [school district] was an arm of the state and as such could not be sued in a federal district court under the Eleventh Amendment to the Constitution.").

an action."). Even *Parks*' own logic defies such a distinction, for in that case it was the school district's *possession* of the capacity to sue (and contract) in its own name—not its *exercise* of that capacity—that the court viewed as sufficient to demonstrate its independence vis-à-vis the state. Had the school district been the defendant, it would still have possessed that same capacity and, thus, the same degree of independence relative to the state.

## B. The Court must conduct a complete factor-by-factor assessment of the Board under *Tradigrain*

The Board does not dispute *Tradigrain*'s applicability to the present case; it does, however, invite the Court to forgo a full-fledged balancing analysis in light of previous federal court decisions that have deemed other institutions (including some components of the University of Texas System) to be "arms of the state" for purposes of Eleventh Amendment immunity. ECF No. 78 at 7–8 (collecting cases).

In *Tradigrain*, the court deliberately imported its multi-factor balancing framework from Eleventh Amendment caselaw. 701 F.2d at 1132 (citing *Huber, Hunt & Nichols v. Architectural Stone Co.*, 625 F.2d 22 (5th Cir. 1980)). But by describing the analysis as "virtually" the same in both contexts, *id.*, the court implicitly acknowledged that a given entity could be an arm of the state for Eleventh Amendment purposes while not being an alter ego of the state for diversity jurisdiction purposes (or vice versa). This qualification alone prevents the Court from using Eleventh Amendment caselaw to short-circuit the *Tradigrain* analysis. It

bears mentioning, however, that divergent outcomes of this sort are a real, and not merely a semantic, possibility. The Fifth Circuit has recognized that certain factors weigh differently in the context of Eleventh Amendment immunity than in the context of diversity jurisdiction. *See Jacintoport Corp. v. Greater Baton Rouge Port Comm'n*, 762 F.2d 435, 440–42 (5th Cir. 1985) (suggesting that some *Tradigrain* factors are "more important" when Eleventh Amendment immunity is at issue). In close cases at least, those factors can tip the overall balance in different directions according to the issue at stake. Moreover, even if it were directly applicable here, Eleventh Amendment caselaw admonishes courts to take a "case-by-case approach" and to "examine the particular entity in question and its powers and characteristics as created by state law." *Richardson v. Southern University*, 118 F.3d 450, 452 (5th Cir. 1997) (ultimately quoting *Laje v. R. E. Thomason General Hospital*, 665 F.2d 724, 727 (5th Cir. 1982)). That instruction is apropos here, as none of the cited cases squarely addresses the Board's Eleventh Amendment immunity, let alone its status under the diversity jurisdiction statute.[7]

---

[7] In *Olivier v. University of Texas System*, 988 F.2d 1209 (5th Cir. 1993), the court assumed, but did not hold, that "[a]n action against the Board as an entity would be barred by the eleventh amendment because the Board is an agency of the State of Texas," *id.* at 1209. That this statement is not a binding holding is made clear by the court's observation that the plaintiff-appellant "d[id] not appear to dispute that the Board of Regents, as an entity, is a state department or agency." *Id.* at 1209 n.3. "An opinion is not binding precedent on an issue [it] 'never squarely addressed,' even if the opinion 'assumed' one resolution of the issue." *Gahagan v. United States Citizenship & Immigration Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)); *see also United States v. Bennett*, 100 F.3d 1105, 1110 (3d Cir. 1996) ("A court's statement concerning an issue not raised on appeal is dicta."); *United States v. Crawley*, 837 F.2d

This is not to say that Eleventh Amendment cases—particularly those involving entities similar to the Board—are entirely irrelevant. So long as the distinct context in which those cases were decided is taken into account, they can offer persuasive guidance in assessing the weights of particular factors and in determining the overall balance. But those cases do not allow the Court to pretermit a full analysis under *Tradigrain*.

### C. Application of the *Tradigrain* framework shows that the Board is an alter ego of the state for purposes of diversity jurisdiction

In applying *Tradigrain*, the Court will follow the six-factor organization set forth in *PYCA Industries, Inc. v. Harrison County Waste Water Mgmt. Dist.*, 81 F.3d 1412, 1416 (5th Cir. 1996), but will modify the specifics of certain factors along the way, as necessary, to more accurately reflect *Tradigrain*'s formulations and to accommodate the particulars of this case.[8]

---

291, 292–93 (7th Cir. 1988) (reasons for viewing a statement as dictum include (1) when "the passage was not grounded in the facts of the case and the judges may therefore have lacked an adequate experiential basis for it," and (2) when "the issue addressed in the passage was not presented as an issue, [and] hence was not refined by the fires of adversary presentation").

[8] Idexx argues that it satisfies a multi-factor test it derives from *Moor*. ECF No. 74 at 20–22. But as the Eighth Circuit has observed, "it is unclear whether the [Supreme] Court intended to articulate a [particular] test" in *Moor*, and, in any event, the *Tradigrain* framework "allows [the Court] to thoroughly consider the factors . . . addressed in *Moor*." *Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d 821, 827 n.3 (8th Cir. 2011).

*Factor 1: How Texas law characterizes the Board.* The first point to consider is "whether state statutes and case law characterize the agency as an arm of the state." *PYCA Indus.*, 81 F.3d at 1416.

The parties do not cite any Texas statute that characterizes the Board as an arm or alter ego of the state. The Board points to Chapter 572 of the Texas Government Code, which defines the term "state agency"—via a cross-reference to the Texas Education Code—as including the University of Texas System. *See* TEX. GOV'T CODE § 572.002(10)(B); TEX. EDUC. CODE § 61.003(10) and (6). But that definition is for purposes of Chapter 572, and due to Chapter 572's limited scope— i.e., ethical rules pertaining to personal financial disclosure, standards of conduct, and conflicts of interest of state officers and employees—it does not amount to a characterization of the Board as an alter ego or arm of the state. *See McDonald v. Bd. of Mississippi Levee Comm'rs*, 832 F.2d 901, 906–07 (5th Cir. 1987) ("[N]either the constitution, statutes, nor case law of Mississippi conclusively identify the Levee Board as an arm of the state. A reference to the Levee Board as an 'agency' of the state by Mississippi courts does not amount to a characterization of the Levee Board as an arm of the state." (footnote omitted)); *Moor*, 411 U.S. at 719 (characterizing as a "simpl[e] . . . generalization" a provision of the California Constitution providing that "[t]he State is divided into counties which are legal subdivisions of the State").

13

As for caselaw, the Board references *Walsh v. University of Texas*, 169 S.W.2d 993 (Tex. Civ. App.—El Paso 1942, writ ref'd), which involved a trespass-to-try-title action brought by several individuals against the University of Texas and the Board. The trial court dismissed the suit upon concluding that the state of Texas was a "necessary party absent." *Id.* at 993. The court of appeals affirmed, reasoning that "[s]ince the property of the University of Texas is the property of the State, a judgment against any party other than the State would be an empty, useless thing." *Id.* The court also stated that "[t]he University and the Board of Regents are institutions of the State, and neither has any existence independent of the State," *id.*, but cited no supporting authority and gave no further explanation of that assertion.

Taken purely at face value, *Walsh* might be seen as supporting the Board's claim to being an alter ego of the state. *See Tradigrain*, 701 F.2d at 1132 ("When examining the treatment of the agency by the state courts, this court has taken note . . . of a state court holding that the statute of limitations, which did not normally run against the state itself, ran against the agency."). Upon closer consideration, however, two points cast serious doubt on that view. First, the statutes that now define and govern the Board's authority were enacted decades after *Walsh* was decided. *See, e.g.*, Tex. Educ. Code § 65.11 (originally enacted in 1971). Second, in more recent years, suits have apparently been successfully brought against the University of Texas and the Board of Regents in state court without the state of

14

Texas being named as a party. *See Univ. of Texas at Austin v. Hinton*, 822 S.W.2d 197 (Tex. App.—Austin 1991, no writ) (affirming judgment against the university and the Board for negligence under the Texas Tort Claims Act). In light of these developments, which call into question *Walsh*'s continuing vitality, the Court finds that *Walsh* offers little support for deeming the Board an alter ego of the state. *Cf. Fiess v. State Farm Lloyds*, 392 F.3d 802, 809 n.27 (5th Cir. 2004).

In the absence of any apposite statutory or decisional law, the Court concludes that this factor is indeterminate and neither favors nor disfavors the Board's alter ego status.

*Factor 2: The Board's funding and financial autonomy*. The second factor focuses on "the source of [the agency's] funding," *PYCA Indus.*, 81 F.3d at 1416, "whether the state is responsible for the agency's debt," and "the degree of general financial autonomy of the agency," *Tradigrain*, 701 F.2d at 1132.

It is undisputed that the University of Texas System receives substantial funding from the state of Texas. In fact, the very data cited by Idexx at oral argument show that in the 2018–19 fiscal year, the budget of the University of Texas at Austin (which is just one component of the broader system overseen by the Board) amounted to $3.106 billion, and that 11% of that amount—i.e., more than $341 million—came from state general revenue. *See* University of Texas at Austin, *Sources of Revenue*, https://tuition.utexas.edu/learn-more/sources-of-revenue (last

visited June 27, 2019). The University of Texas System also obtains money from various other sources, but state funding is a sizeable component of its overall finances, and that necessarily limits the Board's independence from the state.[9]

It appears that the state of Texas is not generally liable for the Board's debts, but the state is substantially involved in some of the Board's debt-related activities. Specifically, while the Board is empowered to issue bonds and conduct related financial activities, TEX. EDUC. CODE § 65.46, the credit agreements, bonds, and notes must be submitted to the Texas attorney general for review, TEX. EDUC. CODE § 65.46(b). *See Richardson*, 118 F.3d at 455 (finding, in the context of Eleventh Amendment immunity, that a university's autonomy was "limited," in part because the university board's "ability to raise funds by borrowing money or issuing notes, bonds, or certificates of indebtedness" required approval by the state of Louisiana's bond commission).

The Board's financial autonomy is further limited by a statutory requirement that it submit to the governor and other state officials annual financial reports detailing how it uses its appropriated money and listing its assets and liabilities. TEX.

---

[9] Idexx points to the 1984-85 fiscal year, when 47% of the University of Texas at Austin's then-$503 million budget (some $236 million) came from state general revenue. Although the proportion of the university's budget derived from state general revenue has declined over time, it has not become negligible relative to the whole, and the absolute dollar amount of such funding remains quite significant in its own right. *See United States ex rel. King v. Univ. of Texas Health Sci. Ctr.-Houston*, 907 F. Supp. 2d 846, 851–52 (S.D. Tex. 2012) (concluding that another component of the University of Texas System "substantially relies on state funding").

GOV'T CODE § 2101.011; *id.* § 403.013. On the other hand, the Board is authorized to "retain control of . . . institutional funds arising out of and by virtue of the educational activities, research, or demonstrations carried on by the institution," TEX. EDUC. CODE § 51.002(9), which would presumably include funds derived from patents.

The Fifth Circuit has explained that "because an important goal of the [E]leventh [A]mendment is the protection of states' treasuries, the most *significant* factor in assessing an entity's status [as an arm of the state for purposes of that provision] is whether a judgment against it will be paid with state funds." *Richardson*, 118 F.3d at 455 (quoting *McDonald*, 832 F.2d at 907); *see also Jacintoport Corp.*, 762 F.2d at 440 ("One of the most important goals of the immunity of the Eleventh Amendment is to shield states' treasuries. . . . The purpose of the immunity therefore largely disappears when a judgment against the entity does not entail a judgment against the state."). Unlike the Eleventh Amendment, however, protection of state treasuries is not the goal of the diversity jurisdiction statute—or of the statute's implicit carve-out for states and the alter egos of states. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 562 (2005) (citing "the fear of [state court] bias" as the key reason for diversity jurisdiction). Consequently, whether and to what extent a money judgment for or against the Board would impact the treasury of the state of Texas is of less relevance in this case. Whatever relevance

17

that consideration has is overshadowed by the other considerations already noted in connection with this factor.

In sum, the Board's funding is substantially dependent on the state of Texas, and its financial autonomy is subject to high-level oversight from the principal organs of state power. The Court concludes that this factor favors the Board's alter ego status but does so less strongly than it would if the issue were whether the Board is an "arm of the state" for purposes of Eleventh Amendment immunity.

*Factor 3: The Board's independent management authority.* "When examining the extent of [an] agency's independent management authority, the court should look to whether the agency has the power to make its own hiring decisions, the power to enter into its own contracts, and the power to engage its own counsel." *Tradigrain*, 701 F.2d at 1132.

The parties do not cite any statutory authority defining the Board's hiring powers as such, but § 65.32 of the Texas Education Code broadly states that "[t]he [B]oard may remove any officer, member of the faculty, or employee connected with the system when in its judgment the interest of the system requires the removal." The Board counters by noting, ECF No. 78 at 11, that Chapter 503 of the Texas Labor Code subjects it to certain aspects of the state's general workers' compensation laws, *see* TEX. LABOR CODE § 503.002, and that Chapter 657 of the Texas Government Code subjects it to regulations pertaining to veterans'

18

employment preferences, *see* TEX. GOV'T CODE § 657.001 *et seq*. These provisions regulate the Board's power over its employees in some respects, but as they do not substitute direct state oversight of individual employment decisions, they do not meaningfully limit the Board's independent management authority in any sense relevant to the *Tradigrain* analysis.

There does not appear to be any express statutory provision in Texas law that empowers the Board to enter into its own contracts, but the existence of such a power seems implicit in § 65.34 of the Texas Education Code, which states that "[a] contract must be approved by the [B]oard or otherwise entered into in accordance with rules of the [B]oard relating to contracting authority." The Board has issued rules based on that authority. *See* Board Rule 10501, §§ 2.2.3 and 2.4; Board Rule 90101, § 13.1.[10] The parties do not cite any statutory authority referencing the Board's power to engage its own counsel, but the Board has assumed such power by creating a rule delegating that authority to the Vice Chancellor and General Counsel. *See* Board Rule 10501, § 2.8.

Looking to the Board's management authority more generally, several statutory provisions are relevant. The Board consists of nine members, each appointed to staggered six-year terms by the Texas governor with the approval of

---

[10]   The current version of the Board's Rules and Regulations is available online at https://www.utsystem.edu/offices/board-regents/regents-rules-and-regulations.

the Texas senate. TEX. EDUC. CODE §§ 65.11, 65.12; *see Richardson*, 118 F.3d at 455 (finding that a university's autonomy was limited when it was governed by a state-appointed board). At the same time, members of the Board have at least a modicum of independence from the state once in office due to the fact that they can only be removed from office through an impeachment trial (unless appointed by the current governor, in which case removal requires a two-thirds vote of the Texas senate). TEX. GOV'T CODE § 665.002(3); Tex. Const. art. 15, sec. 9.

In addition, statute defines the Board's authority in expansive terms. The Board is expressly authorized to: "provide for the administration, organization, and names of the institutions and entities in The University of Texas System in such a way as will achieve the maximum operating efficiency of such institutions and entities," TEX. EDUC. CODE § 65.11; "govern, operate, support, and maintain each of the component institutions . . . of The University of Texas System," TEX. EDUC. CODE § 65.31(a); "prescribe for each of the component institutions courses and programs leading to such degrees as are customarily offered in outstanding American universities, and to award all such degrees," TEX. EDUC. CODE § 65.31(b); "promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as the [B]oard may deem either necessary or desirable," TEX. EDUC. CODE § 65.31(c); "determine and prescribe the number of students that shall be admitted to any course,

department, school, college, degree-program, or institution under its governance," TEX. EDUC. CODE § 65.31(c); and "upon terms and conditions acceptable to it, to accept, retain in depositories of its choosing, and administer gifts, grants, or donations of any kind, from any source, for use by the system or any of the component institutions of the system," TEX. EDUC. CODE § 65.31(e). The Board has used this authority to issue a large number of rules, some of which have been mentioned above.

On the whole, the Board's independent management authority is extensive, with direct incursions on that authority by the state occurring only at the highest levels and/or pertaining to discrete subject areas. The Court therefore concludes that this factor heavily disfavors the Board's alter ego status.

**Factor 4: The local versus statewide nature of the Board's concerns.** The fourth factor asks "[w]hether the agency is primarily concerned with local, as opposed to statewide problems." *Tradigrain*, 701 F.2d at 1132. It is undisputed that the geographic scope of the University of Texas System is wide and that its activities are not confined to a single local area. The institutions comprising the system are located throughout the state of Texas, including in the cities of Arlington, Austin, Dallas, El Paso, San Antonio, Galveston, and Houston. TEX. EDUC. CODE § 65.02. Furthermore, the purpose of the activities undertaken in those locations is not primarily local in nature. *See* TEX. CONST. art. 7, § 10 (providing for the

establishment of the University of Texas, and defining its purpose as "the promotion of literature, and the arts and sciences").

The Court concludes that this factor favors the Board's alter ego status.

***Factor 5: The Board's capacity to sue and be sued in its own name.*** Under *Tradigrain*'s formulation, the fifth factor asks "whether [the agency] has the express authority to sue and be sued in its corporate name." 701 F.2d at 1133. There does not appear to be any authority expressly granting the Board the general right to sue and be sued in its own name. *See United States ex rel. King v. Univ. of Texas Health Sci. Ctr.-Houston*, 907 F. Supp. 2d 846, 853–54 (S.D. Tex. 2012) ("Texas law does not appear to give UTHSCH the authority to file suits for other purposes or to give plaintiffs the authority to sue UTHSCH directly."), *aff'd*, 544 F. App'x 490 (5th Cir. 2013). Texas Education Code § 65.42 states that "[a] suit by The University of Texas System on its own behalf or on behalf of a component institution . . . to recover a delinquent loan, account, or debt owed to [it] must be brought in Travis County." That provision could be read as implicitly recognizing the Board's capacity to sue in its own name, but the lack of any *express* statutory authorization casts doubt on whether the Texas legislature so intended. Contrast the provision relied upon by the

Supreme Court in *Moor*, which stated unequivocally that a county "may sue and be sued." *Moor*, 411 U.S. at 720.[11]

The Court concludes that this factor is indeterminate. It neither favors nor disfavors the Board's alter ego status.

***Factor 6: The Board's right to hold and use property.*** Section 65.39 of the Texas Education Code grants the Board "the sole and exclusive management and control of the lands set aside and appropriated to, or acquired by, The University of Texas System," and provides that the Board "may sell, lease, and otherwise manage, control, and use the lands in any manner and at prices and under terms and conditions the [B]oard deems best for the interest of The University of Texas System, not in conflict with the constitution." This provision disfavors a finding of alter ego status inasmuch as it suggests the Board is largely independent from the state in its management of real property. On the other hand, § 65.33 of the Texas Education Code grants the Board the power of eminent domain and explicitly affirms that any such taking "is declared to be for the use of the state." Idexx points to the court's statement in *Walsh* that "[p]roperty belonging to the University of Texas is the

---

[11] The Board has created a rule stating: "With respect to intellectual property in which the Board of Regents asserts an interest, the institution's president, or his or her designee, shall decide how, when, and where the intellectual property is to be protected and commercialized." Board Rule 90101, § 11.4. This rule is not an *express* grant of authority to sue from the state itself.

property of the State," 169 S.W.2d at 99, but that broad claim does not specify whether the state has actual use of, or effective control over, such property.

There is an apparent absence of statutory authority pertaining to the Board's ownership or use of patents or other forms of intellectual property. As best the Court can discern, whatever right the Board might have to own, hold, and control patented technology derives implicitly from the general grants of authority provided in Chapter 65 of the Texas Education Code, including the Board's rulemaking authority. The Board appears to have adopted this view, as it has created a broad rule stating that it "automatically owns the intellectual property created by individuals subject to this Rule." Board Rule 90101, § 2.

Because the Board has a largely free hand with respect to property, the Court concludes that this factor disfavors the Board's alter ego status.

*     *     *

**_The overall balance_**. To sum up: factors 2 and 4 favor finding the Board to be an alter ego of the state of Texas; factors 3 and 6 disfavor alter ego status (factor 3 heavily); and factors 1 and 5 do not favor either outcome. The chief tension is between factor 2 (the Board's funding and financial autonomy) and factor 3 (the Board's independent management authority). While factor 2 is not as important in this case as it would be in a case involving the question of Eleventh Amendment immunity, the Court nonetheless views it as the best indicator that the state is the

24

"real party in interest" in this case. But the fact that factor 3 heavily disfavors alter ego status makes the overall balance close.

Were the Court writing on a blank slate, it would likely rule that the Board is not an alter ego of the state for purposes of diversity jurisdiction. But components of the University of Texas System have universally been found to be arms of the state under the Eleventh Amendment. *See, e.g.*, *Duncan v. Univ. of Texas Health Sci. Ctr. at Houston*, 469 F. App'x 364, 366 (5th Cir. 2012) (unpublished decision); *Scott v. Pfizer Inc.*, 182 F. App'x 312, 315 (5th Cir. 2006) ([The University of Texas Medical Branch] is an agency of the State of Texas, giving it Eleventh Amendment immunity."); *Fite v. University of Texas M.D. Anderson Cancer Ctr.*, No. 4:12-cv-3739, 2013 WL 3338587, at *2 (S.D. Tex. July 2, 2013) (Ellison, J.). As noted above, decisions involving the Eleventh Amendment immunity of similar entities can be persuasive in assessing the overall balance of factors in close cases. That leads the Court to resolve the balance in favor of the Board's alter ego status. To the extent the outcome of the *Tradigrain* balancing analysis is ambiguous, that ambiguity must be resolved against removal and in favor of remand. *Mumfrey*, 719 F.3d at 397. As the removing party and the party asserting that this Court has subject-matter jurisdiction, Idexx has not carried its burden of demonstrating that federal jurisdiction exists.

25

Because the Board is an alter ego of the state of Texas, it is not a "citizen" within the ambit of federal diversity jurisdiction, and this case must be remanded to the state court where it originated.

## IV.  CONCLUSION

For the reasons given above, the Court RECOMMENDS that Plaintiff's motion to remand be GRANTED and that this suit be REMANDED to the 189th District Court of Harris County, Texas. In light of this recommendation, the Court further RECOMMENDS that all other motions currently pending be DENIED AS MOOT.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections will preclude appellate review of factual findings, conclusions of law, and recommendations, except for plain error.** *Ortiz v. City of San Antonio Fire Dep't*, **806 F.3d 822, 825 (5th Cir. 2015).**

Signed at Houston, Texas, on July 16, 2019.

*Dena Palermo*

**Dena Hanovice Palermo**
**United States Magistrate Judge**

26